UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSLYN MANUFACTURING COMPANY LLC,<br><br>Plaintiff,<br><br>v.<br><br>STELLA-JONES CORPORATION,<br><br>Defendant. | Case No. 2:24-cv-00324-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court are Defendant Stella-Jones Corporation's Motion for Summary Judgment (Dkt. 52) and Motion to Exclude Report and Testimony of Plaintiff's Proposed Expert (Dkt. 48). The Court heard oral argument on October 9, 2026, and the matter is now ripe for review. For the reasons explained below, the Court will grant the motion for summary judgment and deny the motion to exclude as moot.

## BACKGROUND

Plaintiff Joslyn Manufacturing Company LLC brings this cost recovery suit against Stella-Jones under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675. Joslyn

seeks reimbursement of costs incurred from cleaning up the site of its wood treatment facility in Sandpoint, Idaho. It alleges that contamination from Stella-Jones's upgradient wood treatment facility migrated onto its property and commingled with the contamination from Joslyn's own operations.

**A. Initial Discovery and Investigation**

In September 2000, the Idaho Department of Environmental Quality (IDEQ) notified Joslyn that hazardous contaminants had been detected on the site of its wood treatment facility and warranted further investigation. Dkt. 52-3 at 2. Joslyn did not undertake an investigation at that time, and in 2004 IDEQ sued Joslyn to compel Joslyn to investigate and, if necessary, remediate the site. *Id.*

The parties resolved the lawsuit through a 2005 consent judgment that required Joslyn to investigate the contamination through a series of inspections and reports, culminating in a risk management evaluation. *Id.* Under the terms of the consent judgment, if Joslyn's investigations reflected certain levels of contamination, then Joslyn would need to negotiate a separate agreement with IDEQ regarding the implementation of a remedial plan. *Id.* at 3.

Joslyn submitted its risk management evaluation to IDEQ in 2011. *Id.* at 4. The evaluation divided the site into five exposure areas (EAs) for purposes of addressing the contamination, with EA 1 consisting mostly of the footprint of Joslyn's former facility. *Id.* According to Joslyn's investigations, two EAs had soil

and groundwater contamination that exceeded the relevant standards. *Id.* Given these findings, IDEQ ordered Joslyn to develop a remedial action plan (RAP). *Id.*

**B. Development of the 2014 RAP**

Joslyn and IDEQ developed a RAP over the next few years. *Id.* at 4–5. Joslyn's preferred remedies included an above-grade asphalt cap, groundwater monitoring, environmental covenants, and land use controls. *Id.* at 5.

Meanwhile, the parties negotiated over the details of an off-site groundwater monitoring program. *Id.* Specifically, they debated whether monitoring should be measured using the target levels related to groundwater inhalation or groundwater ingestion. *Id.* These target levels differ significantly, with the latter imposing stricter concentration limits. *Id.* at 6–7.

IDEQ maintained that the stricter ingestion limits should apply unless Joslyn successfully negotiated with downgradient property owners to restrict groundwater ingestion on those sites by way of environmental covenants. *Id.* at 5. Joslyn eventually agreed to try to negotiate modifications to a neighboring property's existing environmental covenant so that it would include additional contaminants. *Id.* at 6.

In August 2014, IDEQ approved Joslyn's RAP. *Id.* at 6. The RAP outlined various objectives related to surface soil, subsurface soil, and groundwater. Dkt. 52-8 at 8. Specifically, it required Joslyn to implement the following measures: (1)

asphalt and vegetated soil barriers in EA 1 to prevent direct contact with contaminated soil and to keep stormwater from carrying contaminants off the site; (2) long-term groundwater compliance monitoring, measured against certain target levels; and (3) administrative controls and land-use restrictions, including environmental covenants. *Id.*

The RAP noted that these "remedial actions . . . will eliminate the exposure pathway between the current/future non-residential receptors and underlying impacted soils by constructing physical barriers over impacted soils within the EA 1 Source Area and restricting property uses through [activities and use limitations]." *Id.* at 25.

### C. Groundwater Monitoring Program and Contingency Actions

The RAP also contained a contingency related to groundwater monitoring. *Id.* at 39. Initially, Joslyn would use monitoring wells to evaluate the effectiveness of the plan in treating groundwater contamination. *Id.* at 36–38. But if that monitoring showed steady or increased levels of contamination, then Joslyn would have to enter into additional negotiations with IDEQ to develop a groundwater action plan and evaluate alternative remedies. *Id.* at 38.

As explained above, the relevant target levels for the groundwater monitoring program would depend on whether Joslyn successfully negotiated with the neighboring property owner to expand that property's existing environmental

covenant. *See* Dkt. 52-3 at 8. If Joslyn and the neighboring property owner agreed to expand the environmental covenant, then the less restrictive inhalation target levels would govern. *Id.* But if they could not agree to an amended environmental covenant, then the more restrictive ingestion target levels would apply. *Id.*

### D. Initial Action Pursuant to the 2014 RAP and Subsequent Work

Joslyn began construction of the asphalt and vegetated soil barriers in September 2014 and reported completion to IDEQ in early 2025. Dkt. 52-3 at 9. Joslyn ultimately failed to secure the amended environmental covenant with the neighboring property owner, however, triggering the alternative approach in the RAP and subjecting Joslyn to the more restrictive ingestion target levels for groundwater monitoring. *Id.* at 10. Because Joslyn's groundwater monitoring reports reflected contaminant levels exceeding those targets for two consecutive quarters, IDEQ informed Joslyn in June 2016 that it would need to develop a groundwater action plan and ultimately an addendum to the RAP. *Id.* at 10–11.

IDEQ approved an interim groundwater action plan in November 2016, and Joslyn submitted its remedial action plan addendum (RAPA) in September 2022. *Id.* at 11. The RAPA called for new measures to address the groundwater contamination, including the installation of a containment system and a permeable reactive barrier. Dkt. 53-13 at 7. Joslyn began to implement these remedies in 2023. *See* Dkt. 57 at 12.

### E. This Litigation

Joslyn brought this CERCLA cost-recovery action against Stella-Jones in 2024. *See* Dkt. 1. It alleges that Stella-Jones's upgradient wood treatment facility contributed to the release of hazardous contaminants from the Joslyn site. *Id.* Additionally, Joslyn asserts several state-law claims against Stella-Jones, including trespass, nuisance, and negligence. *Id.* at 7–9.

Stella-Jones now moves for summary judgment, arguing that Joslyn's claim is time-barred by CERCLA's six-year statute of limitations for cost recovery actions arising from remediations. *See* Dkt. 52. Stella-Jones also moves to strike the opinions of Joslyn's expert, Peter Zawislanski. *See* Dkt. 48.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). There must be a genuine dispute as to any *material* fact—a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

## ANALYSIS

### A. Joslyn's Cost-Recovery Claim Under CERCLA

Stella-Jones argues that the statute of limitations on Joslyn's claim for recovery of costs expired in September 2020, six years after Joslyn began to construct the asphalt and vegetated soil barriers pursuant to the 2014 RAP. Dkt. 52-1 at 8. According to Stella-Jones, this work constituted a "remedial action" under CERCLA, and Joslyn's cost recovery action is thus time-barred. *Id.* at 18–21.

Meanwhile, Joslyn contends that its cost-recovery action did not become ripe until 2023, after the adoption of the 2022 RAPA. *See* Dkt. 57 at 21–22. It asserts that the construction of the asphalt and vegetated soil barriers in September 2014 constituted a "removal action" under CERCLA, because the purpose of this

action was to address an "imminent threat" to human health and the environment. *Id.* at 23–24.

### 1. Removal and Remedial Actions under CERCLA

CERCLA divides response actions into two broad categories: removal actions and remedial actions. *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1227 (9th Cir. 2005) (citing 42 U.S.C. § 9601(25)). Removal actions are typically characterized as time-sensitive responses to public health threats. *Id.* at 1227–28. Remedial actions, on the other hand, are often described as permanent remedies to threats for which an urgent response is not warranted. *Id.* at 1228; *see also Pub. Serv. Co. of Colo. v. Gates Rubber Co.*, 175 F.3d 1177,1182 (10th Cir. 1999) ("In broad contrast, a remedial action seeks to effect a permanent remedy to the release of hazardous substances when there is no immediate threat to public health.").

The timeliness of cost-recovery suits under CERCLA is governed by this distinction. For remedial actions, all claims under CERCLA must be brought "within 6 years after initiation of physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2). "Remedial" is defined in 42 U.S.C. § 9601(24) as:

> "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of hazardous substance into the environment, to prevent or minimize the release of hazardous substances so

> that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions as the location of the release as *storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover*, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and *any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment*."

42 U.S.C. § 9601(24) (emphases added).

Meanwhile, for removal actions, all claims under CERCLA must be brought "within three years after completion of the removal action." 42 U.S.C. § 9613(g)(2). "Removal" is defined in 42 U.S.C. § 9601(23) as:

> "the cleanup or removal of released hazardous substances from the environment, such actions as my be necessary taken in the event of the threat of release of hazardous substances into the

> environment, such actions as may be necessary to monitor assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from release or threat of release. The term includes, in addition, without being limited to, *security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for*, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act."

42 U.S.C. § 9601(23) (emphasis added).

To be sure, "[t]he tangled language of CERCLA hardly lends itself to clearcut distinctions between the two types of actions." *W.R. Grace*, 429 F.3d at 1232. But one consistent thread in judicial decisions determining whether an action is "remedial" or "removal" in nature is that "removal actions generally are immediate or interim responses," while remedial actions generally are "permanent responses." *California v. Neville Chem. Co.*, 358 F.3d 661, 667 (9th Cir. 2004).

Indeed, the hallmark of a removal action is "immediacy." *W.R. Grace*, 429 F.3d at 1244. Removal actions are undertaken to deal with "threat[s] to human health or the environment which require[ ] an immediate response." *Id.* They "are often planned and executed relatively quickly in order to immediately abate public health hazards, such as contaminated drinking water." *MPM Silicones, LLC v. Union Carbide Corp.*, 966 F.3d 200, 220 (2d Cir. 2020). "Accordingly, [removal actions] are often undertaken to secure prompt relief from a danger even though the action is not deemed a step toward permanent elimination of the threat." *Id.*

By contrast, remedial actions include only actions "consistent with [a] permanent remedy." 42 U.S.C. § 9601(24). These actions "are undertaken to permanently remediate contamination, generally after months (if not years) of correspondence with regulators, soil testing, data collection, safety and quality control analysis, and feasibility studies." *MPM Silicones*, 966 F.3d at 220. For an action to be "consistent with [a] permanent remedy," a permanent remedy must already have been adopted. *Neville*, 358 F.3d at 667. "The first point at which both parties can be certain that any construction is consistent with a permanent remedy is when the permanent remedy is actually selected." *Id.* In most cases, the permanent remedy is selected when the final remedial action plan is approved. *Id.*

Whether an action qualifies as removal or remedial under CERCLA is question of law that can be decided on summary judgment. *W.R. Grace*, 429 F.3d at 1234.

**2. The Construction of the Engineered Cap Was a Remedial Action**

For the reasons explained below, Joslyn's construction of the asphalt and vegetated barriers in 2014 initiated a remedial action for purposes of CERCLA. Thus, the statute of limitations for Joslyn's cost-recovery action against Stella-Jones expired in 2020.

**First**, the record indicates that the construction of the engineered cap was "consistent with [a] permanent remedy" for the site. 42 U.S.C. § 9601(24). The 2014 RAP characterizes the asphalt and vegetated barriers as part of a long-term solution that would "eliminate the exposure pathway between the current/future non-residential receptors and underlying impacted soils within the EA 1 Source Area." Dkt. 52-8 at 12. The RAP further states that the asphalt and vegetated barriers would have "a secondary benefit by reducing direct infiltration of precipitation and surface water to and through contaminated soils in the EA 1 Source area." *Id.* at 27.

The record supports this determination in other respects. For example, Joslyn's former environmental consultant, Paula Lyon, indicated that the asphalt and vegetated barriers were intended to "permanently eliminate the exposure

pathway for site workers and construction workers in EA-1" and were meant to be "part of the permanent remedy for the site." Dkt. 52-4 at 41, 51. Meanwhile, Joslyn's current environmental consultant, Chris Berg, expressed a similar view about the long-term nature of the RAP's objectives, noting that its remedies "must be maintained into perpetuity." Dkt. 52-6 at 7.

The engineered cap also resembles the specific examples that CERCLA lists in its definition of "remedial," including "confinement," "perimeter protection," and "clay cover." 42 U.S.C. § 9601(23). This resemblance underscores the determination that the construction of the engineered cap was meant to serve as a permanent remedy for the site and thus constituted a remedial action for purposes of CERCLA.

**Second**, the construction of the asphalt and vegetated barriers in 2014 cannot be characterized as a "removal" action under CERCLA, because it was not an "immediate" response to a threat to human health or the environment. Instead, the engineered cap was the product of a lengthy and iterative process between IDEQ and Joslyn that began as early as 2000.

The case law from other jurisdictions supports this conclusion. In *Long Beach Unified School District v. Santa Catalina Island Co.*, the Central District of California noted that a two-year delay between the discovery of the contamination and the submission of a final proposed cleanup plan supported the court's

determination that the subsequent cleanup efforts were remedial in nature. No. CV 19-1139-JFW, 2021 WL 4706552 at *11 (C.D. Cal. 2021).

Here, the delay was much longer. IDEQ alerted Joslyn to the presence of contaminants in 2000, but Joslyn did not begin work on the engineered cap until 2014. *See* Dkt. 52-3 at 2, 9. What is more, according to IDEQ employee Derek Young, there was nothing at the site "that would rise to the level of a requirement for an emergency response action," and Joslyn never took any "emergency response actions" to address the contamination. Dkt. 52-4 at 28, 51.

Joslyn urges a different conclusion, though. It relies primarily on a statement by Mr. Young that IDEQ considered contaminant levels in surficial soils to be an "immediate issue" when it contacted Joslyn in 2000. Dkt. 57 at 23. But putting Mr. Young's statement in context of his other remarks suggests that the opposite turned out to be true. Indeed, Mr. Young's deposition testimony contrasted the situation at the Joslyn site with "a spill of a tanker on a road" or "something [else] that's immediate," where IDEQ "will step in and do that [removal] work on behalf of the responsible part." Dkt. 52-5 at 48. "[T]his particular situation," Mr. Young explained, "did not elevate to that level." *Id.*

**Finally**, the later development of the groundwater action plan and its memorialization in the 2022 RAPA cannot change the fact that the 2014 RAP was intended to be a complete and permanent remedy.

Joslyn argues that the RAP's groundwater contingency was a "plan to make a plan" and that the monitoring was only "kicking the can down the road" because it could not reduce or eliminate the groundwater contamination. Dkt. 57 at 15. But even if the Court accepts this characterization, it fails to alter the analysis.

In *Neville*, the Ninth Circuit held that the pivotal event under CERCLA is the adoption of a remedial action plan—"not a final remedial design." 358 F.3d at 671. Although the 2022 RAPA set forth new remedies for groundwater contamination, the pivotal event remains the adoption of the RAP in 2014.

Further, a remedial action plan that selects a remedy and specifies contingencies if certain targets are not met is still a remedial action plan. As the Central District of California explained in *Long Beach Unified School District*, "[t]he fact that additional investigation and remediation was performed later does not negate the fact that that the remedy set forth in the Remedial Action plan and [the actions] undertaken pursuant to it were intended and expected to be the final, comprehensive response action for the Site." No. CV 19-1139-JFW, 2021 WL 4706552 at *10. In fact, contingent remedies and amended RAPs are familiar features of environmental cleanups. *See, e.g.*, *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 235 (2d Cir. 2014) (treating the removal of 13,000 tons of contaminated soil and the subsequent discovery and removal of

1,200 tons of contaminated river sediment and 30 feet of pipeline from another portion of the site as a single remedial action).

Many courts have recognized that a site typically has just one remediation action for statute of limitation purposes. *See, e.g.*, *Colorado v. Sunoco, Inc.*, 337 F.3d 1233, 1241 (10th Cir. 2003) ("In our view, this language [of the statute] indicates there will be but one 'removal action' per site or facility, as well as a single 'remedial action' per site or facility."); *FirstEnergy Corp.*, 766 F.3d at 235 ("[T]here can only be one remedial action at any given site."); *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F3d 836, 843 (6th Cir. 1994) (holding that all removal activity should be considered part of one removal action).

To be sure, the Second Circuit has recognized that an exception to this rule would apply to later work addressing problems that were unknown, nonexistent, or undisclosed when the original remedial action plan was adopted. *See MPM Silicones*, 966 F.3d at 230–31. As the court explained, when the record reveals that the more recent remediation addresses a different problem than the previous remediation—for example, "a release or threatened release of a hazardous substance that was unrecognized or had not even occurred at the time of the previous remedial activity"—the recent remediation should be treated as a new and distinct remediation for statute of limitations purposes. *Id.*

But the Second Circuit's exception does not apply in this case. The 2014 RAP sought to address groundwater contamination through its covenants, monitoring, and contingency plan. The RAP also recognized that at least some groundwater contamination was attributable to operations on Stella-Jones's property. *See* Dkt. 52-8 at 14. Although the 2014 RAP's proposed actions were "primarily designed to address soil concerns," Joslyn and IDEQ had hoped that such actions would also address the groundwater problem. Dkt. 52-5 at 8, 12. Indeed, groundwater monitoring was "integral" to the 2014 RAP, Dkt. 52-4 at 39, and the subsequent development of the groundwater action plan was the result of a process that was set forth there. *See* Dkt. 52-8 at 37. Thus, it cannot be said that Stella-Jones's contamination was unknown, nonexistent, or nondisclosed when the RAP was adopted.

CERCLA's text supports this conclusion. The statute's definition of a remedial action includes "any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment." 42 U.S.C. § 9601(24). Under this definition, Joslyn's groundwater monitoring program almost certainly qualifies as remedial activity.

**3. CERCLA's Statute of Limitations Is Clear**

In the alternative, Joslyn contends that its claims against Stella-Jones could not have accrued until 2023, because only then did it incur any costs related to

Stella-Jones's groundwater contamination. *See* Dkt. 57 at 19. It relies on the general principle that a limitations period does not begin to run until a cause of action is complete. *Id.* (citing *Clark v. Iowa*, 87 U.S. 583, 589 (1874)). Thus, Joslyn asserts, it could not have brought an action against Stella-Jones until it implemented a groundwater remedy pursuant to the 2022 RAPA. *Id.*

CERCLA's text is clear, though. Under § 9613(g)(2), the statute of limitations for a cost-recovery suit begins to run from the "initiation of physical on-site construction of the remedial act." 42 U.S.C. § 9613(g)(2). That event is defined with respect to the site and the remedy and not to any particular defendant.

What is more, CERCLA anticipates the very situation that Joslyn describes, and provides a remedy in the form of a declaratory judgment. In a timely cost-recovery action, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." *Id.* § 9613(g)(2).

The record shows that Joslyn knew of Stella-Jones's groundwater contamination when it developed the 2014 RAP. Nothing prevented Joslyn from suing Stella-Jones and obtaining a declaration of liability for future costs. Its failure to do so within the next six years is determinative here.

In sum, Joslyn's construction of the engineered cap in 2014 constituted a "remedial action" for purposes of CERCLA. Because all CERCLA cost recovery

claims must be brought "within 6 years after initiation of physical on-site construction of the remedial action," Joslyn's cost-recovery claim against Stella-Jones is time-barred. 42 U.S.C. § 9613(g)(2). Accordingly, the Court will grant Stella-Jones's motion for summary judgment.

**B. Joslyn's State-Law Claims**

Joslyn next argues that the Court should retain jurisdiction over Joslyn's state-law claims, regardless of how it rules on Stella-Jones's summary judgment motion. Dkt. 57 at 26. For the reasons explained below, the Court will decline to exercise supplemental jurisdiction over the claims.

A district court may decline supplemental jurisdiction once it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "In exercising its discretion, the court must consider whether retaining or declining jurisdiction will best accommodate 'the objectives of economy, convenience and fairness to the parties, and comity.'" *Sadid v. Vailas*, 936 F. Supp. 2d 1207, 1233 (D. Idaho 2013) (quoting *Trustees of Constr. Indus. & Laborers Health & Welfare Trust v. Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 925 (9th Cir. 2003)). "The fact that the federal claims giving rise to federal jurisdiction no longer remain in a case, however, weighs in favor of a decision to decline supplemental jurisdiction." *Id.*

This litigation was phased to first address the timeliness of Joslyn's cost-recovery claim. *See* Dkt. 35. Discovery related to Joslyn's state-law claims has not even begun. Thus, the Court finds that the above-mentioned considerations weigh in favor of adjudication of Joslyn's state-law claims by an Idaho state court, and it will decline to exercise supplemental jurisdiction.

**ORDER**

**IT IS ORDERED that:**

1. Defendant's Motion for Summary Judgment (Dkt. 52) is **GRANTED**.
2. Plaintiff's cost-recovery claim is **DISMISSED WITH PREJUDICE**.
3. Plaintiff's remaining state-law claims are **DISMISSED WITHOUT PREJUDICE**.
4. Defendant's Motion to Exclude Report and Testimony of Plaintiff's Proposed Expert (Dkt. 48) is **DENIED AS MOOT**.

DATED: October 14, 2026

B. Lynn Winmill
U.S. District Court Judge